IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NetJets Aviation, Inc., *et al.*,

      Plaintiffs,

v.

Stephen G. Perlman., *et al.*,

      Defendants.

Case No: 2:22-cv-2417

Judge Graham

Magistrate Judge Jolson

Opinion and Order

Plaintiffs NetJets Aviation, Inc., NetJets Sales, Inc., and NetJets Services, Inc. bring this action for a declaratory judgment that defendants Stephen G. Perlman, the Stephen G. Perlman Trust, and Rearden LLC are the alter egos of RS Air, LLC. NetJets alleged in other judicial proceedings that RS Air had breached contracts with NetJets. RS Air filed for bankruptcy, and NetJets' proof of claim against RS Air was allowed in the amount of $1.7 million. NetJets recovered only about $100,000 through the bankruptcy proceedings, and it now seeks to recover the rest from the alleged alter egos.

This matter is before the Court on defendants' motions to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). For the reasons stated below, the Court denies the motion to dismiss filed by the Perlman defendants (Stephen G. Perlman and the Perlman Trust) and grants the motion to dismiss filed by Rearden LLC.

### I. Background

#### A. The Relationship Between NetJets and RS Air

The litigation before the Court is but the latest in a long-running, acrimonious dispute between NetJets and Perlman and his company RS Air, based in California. Because of the lengthy history, some context is in order before the Court reviews the jurisdictional facts.

The parties agree that they had a good relationship from 2001 to mid-2017. NetJets sells fractional ownership interests in private business aircraft. In 2001 Perlman formed RS Air and used it to purchase a fractional share (defined as a 6.25% interest) in a NetJets aircraft. *See* Aug. 8, 2022 Perlman Decl. (Doc. 9-1), ¶ 8. Perlman was the sole member and manager of RS Air. *Id.*, ¶¶ 8, 9.

Over time, RS Air bought shares in two other aircraft. For each transaction, NetJets and RS Air entered into purchase and management agreements under which RS Air was entitled to 50 hours of flight time per year for each aircraft in which it held a share.

NetJets provided management and support services, such as the provision of crew members, flight planning, aircraft repair, and maintenance. Purchasers owed a fixed monthly fee for management services. They also owed an "occupied hourly fee," which represented the variable costs associated with each hour of flight time. The variable costs included expenses for fuel and for communications services. *See* State Court Complaint (Doc. 9-4 at PAGEID 219), ¶¶ 11–14.

The relationship between NetJets and RS Air began to deteriorate in July 2017 when a Cessna Citation X aircraft, in which RS Air owned a share, was involved in a non-injury incident. The aircraft was damaged and declared a total loss for insurance purposes.

The parties offer different characterizations of the incident. NetJets describes it as a "maintenance event" in which a third-party provider damaged the aircraft while performing maintenance at an airport in Henderson, Nevada. *Id.*, ¶ 33. NetJets denies that it was responsible for the incident in any way and claims that the incident did not affect RS Air's ability to exercise its rights and privileges. Though NetJets removed the aircraft from service, RS Air had access to other aircraft under the parties' Master Interchange Agreement. *Id.*, ¶ 34.

Defendants call the incident a crash. *See* Aug. 8, 2022 Perlman Decl., ¶ 10. Perlman did not know of the incident until months later when he contacted NetJets about renewing the Citation X contract. He says that NetJets downplayed the matter as a maintenance truck running into a parked aircraft. *See* May 18, 2021 Perlman Decl. (Doc. 9-2), ¶ 17. He sought further information from NetJets and the insurance carrier, but they refused his requests.

Perlman then filed a records request with the Federal Aviation Administration. *Id.*, ¶¶ 23–24. The FAA provided Perlman with a witness statement from the investigation. The statement indicated that a NetJets pilot "had made a mistake and had created a fuel imbalance" in the aircraft, which had caused fuel to vent from one of the wings. *In re RS Air, LLC*, No. 20-51604 (N.D. Cal. Bankr. Ct.), Doc. 35-3. A third-party technician, who was attempting to correct the imbalance, started one of the engines to turn the aircraft. After being turned, the aircraft was not "chocked," or prevented from rolling by the use of blocks on the tires. While the technician was in the aircraft, it began to roll. It rolled off the ramp surface and downhill through a fence *Id.*

According to Perlman, NetJets attempted to force RS Air into an aircraft substitution agreement. The proposed agreement was unacceptable to Perlman because, among other things, it

2

valued the Citation X at its salvage value. *See* May 18, 2021 Perlman Decl., ¶ 18. When RS Air sought information about the incident and the aircraft's insurance coverage, NetJets allegedly threatened legal action on a past contract, but it did offer to pay what it claimed was the insured fair market value of the aircraft prior to the incident. *Id.*, ¶ 21.

Perlman pursued insurance-related documents by working through the California Department of Insurance. NetJets' insurance carrier then produced documents which Perlman believed showed that the insured replacement value was "materially greater" than the market value that NetJets had offered to RS Air. *Id.*, ¶ 23. Perlman concluded that NetJets had attempted to withhold information from him because it intended to pocket the difference between the insurance proceeds and what it had offered to pay or credit to RS Air. *Id.*

### B. NetJets files Suit in State Court in Ohio

Perlman wanted to end the relationship between RS Air and NetJets. He proposed that NetJets buy back at fair market value its shares in the Citation X and another aircraft, a Cessna 560 Citation Encore+, and that NetJets refund to RS Air the value of its prepaid flight hours. *Id.*, ¶ 26. RS Air would keep what it learned about NetJets confidential. NetJets did not accept that proposal.

NetJets sued RS Air in Ohio state court in June 2018. NetJets alleged that RS Air had breached its contractual obligations by failing to pay monthly management fees and occupied hourly fees. NetJets asserted that the failure to pay led to an event of default under which it had a contractual right to buy back RS Air's interest in each plane at fair market value minus the unpaid fees. Net Jets sought over $2.1 million in damages. *See NetJets Aviation, Inc. et al. v. RS Air, LLC*, No. 18CV5301 (Franklin Cnty. Ct. of C.P.), Pl.'s Oct. 19, 2020 Final Pretrial Statement, pp. 5–6.

RS Air filed several counterclaims, including for fraud relating to NetJets' conduct following the incident at the Henderson, Nevada airport. RS Air also asserted a counterclaim for breach of contract, alleging that NetJets had failed to timely pay RS Air the pre-incident fair market value of its share in the Citation X. RS Air sought damages of over $1 million. *See id.,* Def's Oct. 19, 2020 Final Pretrial Statement, p. 19.

A trial in the state court case was set to begin on Monday, November 9, 2020.

### C. RS Air initiates Bankruptcy Proceedings in California

On Friday, November 6, 2020, RS Air filed a Chapter 11 bankruptcy petition in the Northern District of California. *See In re RS Air, LLC*, No. 20-51604 (N.D. Cal. Bankr. Ct.). It did so under a new subchapter for small businesses. *See* 11 U.S.C. § 1182(1)(A).

NetJets filed a proof of claim, asserting that it was an unsecured creditor in the amount of $2,133,263. In support, NetJets attached its complaint in the Ohio state court action. NetJets was RS Air's largest non-insider creditor and held 98% of non-insider debt.

NetJets soon filed a motion to dismiss the bankruptcy proceedings on the grounds that the petition was filed in bad faith and for purposes of thwarting the Ohio state court action. *See* Bankr. Ct. Doc. 22.

The Bankruptcy Court denied NetJets' motion to dismiss. *See* Bankr. Ct. Doc. 255. The court called it a "close decision" because there were factors which supported a conclusion of good faith but also factors which supported a conclusion of bad faith. *Id.*, p. 5. Ultimately, the court found that the Plan of Reorganization submitted by the debtor demonstrated its intentions to proceed in good faith.

NetJets also filed a motion for an order allowing it to assert an alter ego cause of action on the debtor's behalf. *See* Bankr. Ct. Doc. 118. NetJets argued that it had standing to bring a derivative claim against Perlman and Rearden LLC because the debtor had failed to bring a veil-piercing claim against them.

The Bankruptcy Court denied this motion as well. *See* Bankr. Ct. Doc. 180. The court found that the proposed claim was not colorable because NetJets' allegations failed to support a finding that either: (1) RS Air and Perlman (or RS Air and Reardon) functioned as a single economic entity, or (2) there existed an overall element of injustice or unfairness. *Id.*, pp. 3–12 (applying Delaware law).

NetJets additionally filed a motion to apply setoff. The parties agreed that RS Air would liquidate its remaining fractional shares and operating credits with NetJets. NetJets would pay $365,692 to the estate to buy back the shares. But RS Air objected to NetJets' proposal that the buyback amount be applied as a setoff against NetJets' $2,133,263 claim. The Bankruptcy Court however found that the elements for setoff were satisfied and thus granted NetJets' motion. *See* Bankr. Ct. Doc. 139.

The debtor proposed a Plan of Reorganization for a Small Business, to which NetJets objected. NetJets argued that the Plan was a disguised liquidation designed to allow Perlman to evade liability owed to NetJets. The Bankruptcy Court rejected this argument and held that the Plan was fair and equitable and proposed in good faith. *See* Bankr. Ct. Docs. 254, 308.

The Bankruptcy Court confirmed the Plan on October 17, 2021. *See* Bankr. Ct. Doc. 309. Under the confirmed Plan, NetJets' $2,133,263 claim was allowed and offset by $365,692, for a net

4

allowed claim of $1,767,571.15. RS Air had no remaining assets for unsecured creditors, but Perlman agreed to contribute $100,000 in new value to be distributed to unsecured creditors, chiefly NetJets.[1]

The parties filed five separate appeals to the Bankruptcy Appellate Panel of the Ninth Circuit. Three of those appeals bear mentioning here. First, the Bankruptcy Court's decision on setoff was appealed, and the B.A.P. affirmed the Bankruptcy Court's decision to allow setoff. *In re RS Air, LLC*, No. 21-1080 (B.A.P. 9th Cir. Apr. 26, 2022), Doc. 39.

Second, the B.A.P. reversed the Bankruptcy Court's decision denying NetJets' motion to assert a derivative alter ego claim. *In re RS Air, LLC*, No. 21-1102 (B.A.P. 9th Cir. Apr. 26, 2022), Doc. 53. The B.A.P. held that the Bankruptcy Court erred by weighing the probative value of NetJets' veil-piercing allegations. The B.A.P. found that NetJets had stated a colorable claim because the "factual allegations which, taken as true, can establish some of the factors which courts may rely upon under Delaware law, including that Debtor was not adequately capitalized, ignored corporate formalities, and functioned as a façade." *Id.*, p. 9.

---

[1] Bankruptcy Court Judge M. Elaine Hammond made several observations about the parties and their attorneys which resonate already with this Court. She called the proceedings "contentious" and commented that the parties had established a track record of engaging in costly litigation and had "not shown an ability to work through basic issues without court involvement." *See* Bankr. Ct. Doc. 308, p. 5; Doc. 180, p. 4. This caused her to express "significant concerns about the costs of future litigation." *Id.* Judge Hammond also expressed her views that RS Air had filed "this [bankruptcy] case to avoid trial in the Ohio state court" and that NetJets had engaged in "aggressive" discovery tactics at "significant costs for limited benefits." Bankr. Ct. Doc. 139, p. 5.

The "rancor" which the Bankruptcy Court witnessed has carried over to this Court. Bankr. Ct. Doc. 254, p. 4. In the short lifespan of this action, the parties have filed well over a thousand pages of briefing and documents related to the motions to dismiss and to their attempts to file surreply briefs. The parties' briefs contain much acrimony.

NetJets is the world's largest private business jet operator and is held by Berkshire Hathaway, one of the largest public companies in the world. Perlman is a prolific Silicon Valley innovator and investor. *See* May 18, 2021 Perlman Decl., ¶¶ 78–85 (recounting that his various business startups have sold for hundreds of millions of dollars, including one that sold for $500 million and another that sold for nearly $1 billion).

This bitter dispute between sides with immense resources has engendered protracted litigation, which has played out in state court, bankruptcy court, the Bankruptcy Appellate Panel of the Ninth Circuit (five appeals filed), and now in this United States District Court. The parties have fought over an amount that, in relative terms, is a pittance to them. Quite possibly, the lawyers are the only ones benefitting from this fight. *See* Bankr. Ct. Doc. 254, p. 14 ("As RS Air and NetJets each have funds available to them, litigation instead of negotiation has resulted.").

Third, the B.A.P. affirmed the Bankruptcy Court's confirmation of the Plan of Reorganization. *In re RS Air, LLC*, No. 21-1227 (B.A.P. 9th Cir. Apr. 26, 2022), Doc. 31. It did so in an order that was issued simultaneously with the B.A.P.'s reversal of the derivative alter ego decision. The B.A.P. said that this meant that further proceedings on the alter ego issue would be unnecessary. The bankruptcy estate had not asserted a veil-piercing claim, and the confirmed Plan did not administer or dispose of such a claim. The estate's ability to assert a claim terminated upon the Plan becoming effective. The B.A.P.'s affirmance of the Plan thus mooted NetJets' attempt to assert a derivative alter ego claim. *See In re RS Air, LLC*, No. 21-1102 (B.A.P. 9th Cir. Apr. 26, 2022), Doc. 53, p. 2 n.2, p. 3 n.3.

On May 11, 2022, RS Air distributed checks to holders of non-insider, unsecured claims. The checks were in the amount of their pro-rata share of $100,000. *See* Bankr. Ct. Doc. 355. NetJets' pro-rata share was about 98%. The Bankruptcy Court later entered an Order of Discharge. *See* Bankr. Ct. Doc. 358.

    **D.    NetJets files Suit in this Court; Defendants move for Contempt**

On June 8, 2022, NetJets filed this action after the B.A.P. resolved all matters on appeal. The complaint requests a declaratory judgment that Perlman, the Perlman Trust, and Rearden are the alter egos of RS Air. NetJets seeks to pierce the corporate veil of RS Air and recover from Perlman, the Trust, and Rearden the amount still owing from the $1,767,571.15 claim allowed in Bankruptcy Court.

After this suit was filed, defendants filed a motion in the Bankruptcy Court for an order holding NetJets in contempt. Defendants (who were called the Non-Debtor Movants in the bankruptcy proceedings) argued that NetJets had violated the Bankruptcy Court's Order of Discharge by filing a lawsuit in this Court.

In a November 2, 2022 Order, the Bankruptcy Court denied the Non-Debtor Movants' motion for contempt. *See* Bankr. Ct. Doc. 367. The Bankruptcy Court framed the issue as follows: "whether RS Air's discharge protects Non-Debtor Movants from litigation and recovery on alter ego claims asserted by NetJets, not disputed by RS Air, and on which RS Air provided a pro rata distribution to NetJets." *Id.*, p. 4. The Bankruptcy Court found under bankruptcy law and Ninth Circuit precedent that a discharge injunction does not extend to non-debtors. As such, the Bankruptcy Court held that the Non-Debtor Movants "have not established their threshold argument that RS Air's Discharge protects Perlman, the Trust and Rearden from alter ego claims." *Id.*, p. 9.

The Non-Debtor Movants have filed a motion for reconsideration of the Bankruptcy Court's Order. *See* Bankr. Ct. Doc. 368.

### E.     Jurisdictional Facts

The Court turns now to the facts specifically relating to personal jurisdiction. Each of the NetJets plaintiffs (NetJets Aviation, Inc., NetJets Sales, Inc., and NetJets Services, Inc.) are Delaware corporations with principal places of business in Ohio.

It must be noted that NetJets does not argue that defendants themselves have had sufficient contacts with Ohio to satisfy the standard for exercising personal jurisdiction. Rather, NetJets argues that RS Air's contacts with Ohio should be imputed to defendants under an alter ego theory of personal jurisdiction. The parties have made written submissions, including declarations, on the issue.

#### 1.     RS Air

Non-party RS Air is a Delaware limited liability company with its principal place of business in California. Perlman formed RS Air in 2001. According to Perlman, he created RS Air because NetJets advised him to form a business entity in order to participate in NetJets' fractional jet ownership program. *See* Aug. 8, 2022 Perlman Decl., ¶ 8. Perlman described RS Air as "a single purpose entity" which provided services for him and his affiliated entities. *See* May 18, 2021 Perlman Decl., ¶ 5. The services related to providing flight time to Perlman, other passengers and "fragile technology prototypes," which Perlman wanted to be flown "from one location to another to save time, cost, and/or to prevent damage from baggage handling on commercial flights." *Id.* RS Air has no employees. *See* Feb. 21, 2020 Perlman Dep. (Doc. 17-5), p. 76; Feb. 20, 2020 Cindy Ievers Dep. (Doc. 17-17), p. 11.

NetJets and RS Air entered into numerous agreements which served as the basis of NetJets' breach of contract claims in Ohio state court. Each of these agreements contained forum selection clauses providing that courts in Ohio would have jurisdiction over any disputes arising under the agreements. *See e.g.*, Doc. 17-47 (Citation X Purchase Agr., § 9.4; Citation X Owners Agr., § 10; Citation X Management Agr., § 22; Citation X Master Interchange Agr., § 11; Citation X Amended and Restated Fractional Ownership Program Management Services Agr., § 25).

In the Ohio state court action, RS Air filed an answer and counterclaim. RS Air admitted that venue was proper and admitted the existence of the forum selection clauses. *See* State Court Answer (Doc. 17-48), ¶¶ 9, 19, 20, 45. In its counterclaim, RS Air asserted that venue was proper in Ohio pursuant to the forum selection clauses. *See* State Court Counterclaim (Doc. 17-48), ¶ 56.

### 2. Stephen G. Perlman

Defendant Perlman is a California resident and is the sole member and manager of RS Air. *See* Aug. 8, 2022 Perlman Decl., ¶¶ 2, 8, 9. He has no significant contacts with Ohio. *Id.*, ¶ 6.

The complaint asserts that Perlman exercises full and complete control over RS Air. NetJets describes RS Air as a "shell entity" which Perlman "created solely to serve Perlman and/or his other controlled entities" for the purpose of participating in the fractional aircraft ownership program. Compl., ¶ 24. Perlman used RS Air's flight ownership for both business and personal and family travel. *See* Dec. 17, 2020 Perlman Decl. (Doc. 17-12), ¶ 14.

Perlman allegedly controlled the flow of funds into and out of RS Air, transferring money from his personal account to RS Air's account in order to pay RS Air's expenses. *See* Compl., ¶ 33; Feb. 20, 2020 Ievers Dep., p. 12. NetJets alleges that Perlman's practice was to keep minimal funds on hand in RS Air's account. Compl., ¶ 32.

NetJets further alleges that Perlman did not provide RS Air with any employees or facilities of its own. He allegedly used employees of Rearden LLC to handle financial and bookkeeping matters, and he allegedly used office space and communication channels (such as a telephone number and email address) belonging to Rearden in order to conduct RS Air's affairs.

NetJets contends that Perlman chose to have RS Air forgo corporate formalities. According to NetJets, Perlman failed to prepare or maintain basic corporate records for RS Air. Further, RS Air did not enter into any agreements with Perlman or his affiliated entities to memorialize the parties' rights and obligations with respect to the provision of funding and resources.

### 3. The Perlman Trust

Defendant Stephen G. Perlman Revocable Trust was created by Perlman under California law in 1997. *See* Aug. 8, 2022 Perlman Decl., ¶ 7. Perlman is the settlor and trustee of the Trust. Perlman is also a beneficiary, along with his wife and child, who are California residents. The Trust property is located primarily in California; no property is located in Ohio. *Id.*

NetJets alleges that it is possible that the Trust, rather than Perlman, is the sole owner and member of RS Air. NetJets cites the record of the Bankruptcy Court on this point. Perlman stated that he put assets under his control, including RS Air, into the Trust. *See* Dec. 17, 2020 Perlman Decl., ¶ 2. He later testified at a hearing that the "actual owner or member" of RS Air is the Trust. *See* Trans. of May 21, 2021 Bankr. Ct. Hearing (Doc. 17-13), p. 99; *accord* Aug. 30, 2021 Perlman Dep. (Doc. 17-14), p. 41. In other court records, including his declaration in this case, Perlman has

stated that he has always been the sole member of RS Air. *See* Aug. 8, 2022 Perlman Decl., ¶ 8; Dec. 17, 2020 Perlman Decl., ¶ 1.

Thus, it is NetJets' position that to the extent Perlman uses the Trust to control RS Air, that the Trust is subject to an alter ego theory as well.

In its brief, the Trust concedes that Perlman's interest in RS Air was transferred to the Trust. *See* Reply Br. of Defs. Perlman and the Trust (Doc. 18), pp. 10–11. The Trust cites to certain parts of the bankruptcy proceedings in which Perlman testified that the Trust owns 100% of the membership interest in RS Air and that Perlman, in turn, is the 100% member-manager of the Trust. *See* Trans. of Dec. 9, 2020 Bankr. Ct. Hearing (Doc. 18-2), pp. 4, 27.

### 4. Rearden LLC

Defendant Rearden is a California limited liability company with its principal place of business in California. Perlman and/or the Perlman Trust are its members. Rearden has about 10 employees. *See* Feb. 20, 2020 Ievers Dep., p. 11. NetJets alleges that Perlman exercises full and complete control over Rearden. Rearden does not have a corporate affiliation with RS Air. *See* Feb. 20, 2020 Ievers Dep., p. 10; Aug 8, 2022 Perlman Decl. for Rearden (Doc. 7-1), ¶ 4.

Pearlman uses Rearden as a "startup incubator" for creative and technological ideas. *See* Aug. 8, 2022 Perlman Decl. for Rearden, ¶ 2; Dec. 17, 2020 Perlman Decl., ¶ 13; Feb. 21, 2020 Perlman Dep., p. 21. The ideas may relate to "movies or animations or games" and, if they get "traction," could lead to the development of a patent or copyright. *Id.*

According to NetJets, Rearden received a benefit from RS Air's fractional jet ownership. Rearden employees and technological prototypes used RS Air's flight hours with NetJets. *See* Aug 8, 2022 Perlman Decl. for Rearden, ¶ 6. Ultimately, Perlman reimbursed RS Air for the services used by Rearden. *See* RS Air Bankr. Ct. Brief (Doc. 17-31), p. 3. NetJets further alleges that Rearden employees and resources, including office space, telephone numbers and email addresses, were used by Perlman to conduct RS Air's business affairs. *See* Apr. 15, 2021 Perlman Dep. (Doc. 17-42), pp. 44–45; Aug. 8, 2022 Perlman Decl. for Rearden, ¶ 7. Cindy Ivers, Rearden's Vice President of Finance, handled RS Air's bills, ran financial projections, and kept track of RS Air's contracts with NetJets. *See* Feb. 20, 2020 Ievers Dep., pp. 12–13; Feb. 21, 2020 Perlman Dep., pp. 109, 190.

NetJets alleges – based on admissions made by RS Air in the bankruptcy proceedings – that Rearden had no formalized contracts or agreements governing its relationship with RS Air. *See* Responses to NetJets' 2004 Request (Doc. 17-18), Nos. 9, 10; March 16, 2021 Perlman Decl. (Doc. 17-43), ¶¶ 3, 6. RS Air allegedly did not compensate Rearden for use of its employees or resources.

Case: 2:22-cv-02417-JLG-KAJ Doc #: 34 Filed: 12/16/22 Page: 10 of 17  PAGEID #: 1325

## II.    Rule 12(b)(2) Standard of Review

Defendants move under Federal Rule of Civil Procedure 12(b)(2) to dismiss the complaint for lack of personal jurisdiction. "The party seeking to assert personal jurisdiction bears the burden of demonstrating that such jurisdiction exists." *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012). Plaintiff's burden varies depending on how the district court handles the jurisdictional issue, as the court may: (1) decide the motion on the basis of written submissions and affidavits alone, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

Where, as here, the court does not conduct an evidentiary hearing, plaintiff must establish a "prima facie" case of personal jurisdiction. *Bridgeport Music, Inc. v. Still N the Water Publ'g*, 327 F.3d 472, 476–78 (6th Cir. 2003); *Smith v. Home Depot USA, Inc.*, 294 Fed. App'x 186, 188–89 (6th Cir. 2008). In this posture, "the plaintiff may not stand on his pleadings, but must show the specific facts demonstrating that the court has jurisdiction." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012). The court "may consider the defendant's undisputed factual assertions" but must consider disputed facts in a light most favorable to the plaintiff. *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012).

## III.    Discussion

### A.    Introduction to the Alter Ego Theory of Personal Jurisdiction

"'[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.'" *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)). State courts also recognize the alter ego theory of personal jurisdiction. *See, e.g., State ex rel. DeWine v. 9150 Grp., L.P.*, 2012-Ohio-3339, ¶ 24, 977 N.E.2d 112, 120 (Ohio Ct. App.); *Maloney-Refaie v. Bridge at Sch., Inc.*, 958 A.2d 871, 880–81 (Del. Ch. 2008).

NetJets must rely on an alter ego theory of personal jurisdiction, as defendants are non-residents who had no meaningful contacts of their own with Ohio. NetJets argues that defendants are alter egos of RS Air, which did have significant contacts with Ohio.

10

Defendants do not contest the proposition that RS Air would be subject to personal jurisdiction in Ohio. "A valid assertion of personal jurisdiction must satisfy both the state long-arm statute, and constitutional due process." *Nationwide Mut. Ins. Co. v. Tryg Intern. Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996). NetJets has established that RS Air transacted to do business with NetJets in Ohio on multiple occasions and that RS Air expressly consented to submit to the jurisdiction of Ohio courts for disputes arising out of their contractual dealings. *See, e.g.*, Citation X Purchase Agr. (Doc. 17-47), § 9.4. The Court thus finds that RS Air would be subject to the Court's exercise of personal jurisdiction, were it a party. *See* O.R.C. § 2307.382(A)(1) (Ohio's long-arm statute, providing that a court may exercise personal jurisdiction over a person who transacts any business in Ohio); *Air Prod. & Controls, Inc. v. Safetech Intl, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007) (to satisfy constitutional due process, defendant must purposefully avail himself of the privilege of acting in the forum state and the cause of action must arise from or relate to the defendant's activities there).

A plaintiff may use an alter ego theory to establish personal jurisdiction over an individual or parent company which "'exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction.'" *Lyngaas v. Ag*, 992 F.3d 412, 420 (6th Cir. 2021) (quoting *Indah v. S.E.C.*, 661 F.3d 914, 921 (6th Cir. 2011)).

A court should look to state law in conducting the alter-ego analysis. *Id*; *Estate of Thomson*, 545 F.3d at 362. Sitting in diversity, this Court looks to Ohio choice-of-law rules. *Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014).

Ohio law directs courts to apply "the law of the state of incorporation when determining issues of veil-piercing." *MA Equip. Leasing I LLC v. Tilton*, No. 2:09-CV-880, 2010 WL 11538520, at *8 (S.D. Ohio Aug. 19, 2010) (citing cases); *accord Harrington v. Plehn-Dujowich*, No. 1:21-CV-00960-PAB, 2022 WL 462815, at *4 (N.D. Ohio Feb. 15, 2022). Ohio's Revised Limited Liability Company Act provides that "[t]he law of the state or other jurisdiction under which a foreign limited liability company is formed" governs its organization and internal affairs and the liability of its members. O.R.C. § 1706.51(A)(1),(2). Here, Delaware law applies to the alter ego analysis because RS Air is a Delaware limited liability company.

Rearden disagrees and argues that the choice-of-law provisions in the contracts between NetJets and RS Air should control. Those contracts selected Ohio law. *See, e.g.*, Citation X Purchase Agr. (Doc. 17-47), § 9.4. Rearden contends that the parties' choice of law should be respected.[2]

---

[2] Rearden is the only party to argue that Ohio law should apply to the alter ego analysis. Rearden's position can be explained by the fact that Ohio law does not recognize horizontal veil-piercing,

11

Rearden's argument must be rejected for the simple reason that an alter ego claim, not breach of contract claim, is before the Court. Though NetJets' claim in this case refers back to RS Air's breach of contract, it does do not arise under the contracts between NetJets and RS Air. Indeed, NetJets' breach of contract claims against RS Air were resolved through the bankruptcy proceedings, where NetJets' proof of claim was uncontested and allowed in the amount of $1,767,571.15. *See Trustees of Operating Engineers Loc. 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 383 (6th Cir. 2019) (holding that "an uncontested proof of claim that is allowed pursuant to 11 U.S.C. § 502(a) is a final judgment on the merits for the purposes of res judicata").

### B. Alter Ego Standard under Delaware Law

"The purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible for the inequitable conduct accountable and to prevent that party from using another corporation to shield itself from liability." *In re Opus E., LLC*, 528 B.R. 30, 57–58 (Bankr. D. Del. 2015); *see also Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (alter ego theory applies where dominant person or company "has created a sham entity designed to defraud investors and creditors"). As "limited liability is the general rule, not the exception," piercing the corporate veil should not be done lightly. *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 270 (D. Del. 1989).

To prevail on an alter ego claim, plaintiff must show that the company and its alleged alter ego "operated as a single economic entity" and that "an overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 528 (D. Del. 2008). A multi-factor test applies to determine whether a "single economic entity" existed: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders." *Id.* at 528–29 (citing *United States v. Pisani*, 646 F.2d 83, 88 (3d. Cir. 1981)); *accord Maloney-Refaie*, 958 A.2d at 881.

"'While no single factor justifies a decision to disregard the corporate entity,' some combination of the above is required, and 'an overall element of injustice or unfairness must always

---

whereby a plaintiff tries to pierce the corporate veil of one company, like RS Air, to reach a sister company, like Rearden. *See Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, 468, 905 N.E.2d 613, 617 (Ohio 2009). Delaware law, however, allows for horizontal veil-piercing. *See In re Maxus Energy Corp.*, 641 B.R. 467, 558 (Bankr. D. Del. 2022).

be present, as well.'" *Trevino*, 583 F.Supp.2d at 529 (quoting *U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D. Del. 1988)).

      **C.     The Perlman Defendants**

The Court finds that NetJets has established a prima facie case of personal jurisdiction as to Stephen Perlman individually. NetJets has not only made extensive allegations but has also offered evidence in support of its alter ego theory.

Perlman was the founder and sole member and manager of RS Air. *See* Aug. 8, 2022 Perlman Decl., ¶¶ 8, 9. RS Air had no employees or other managers or officers, nor did it have any office space, physical facilities or channels of communication of its own. *See* Feb. 21, 2020 Perlman Dep., p. 76; Apr. 15, 2021 Perlman Dep., pp. 44–45; Aug. 8, 2022 Perlman Decl. for Rearden, ¶ 7. RS Air had one purpose – as the means through which Perlman, his family, and his other business entities could participate in NetJets' program and travel conveniently by air. *See* May 18, 2021 Perlman Decl., ¶ 5.

There was of course nothing improper about this arrangement. According to Perlman, NetJets was the one who required that he create a business entity whereby he could participate in the fractional jet ownership program. *See* Aug. 8, 2022 Perlman Decl., ¶ 8.

But the way Perlman allegedly operated or used RS Air supports NetJets' alter ego theory. According to NetJets, RS Air failed to observe the formalities of having contracts, invoices or the like in connection with RS Air's provision of flight time to others. *See* Response to NetJets' 2004 Request, No. 9. Also according to NetJets, Perlman did not require RS Air to keep business records, resolutions, minutes or insurance policies. *Id.*, Nos. 1, 3; March 16, 2021 Perlman Decl., ¶¶ 2, 4, 7; Responses to NetJets' Revised 2004 Request (Doc. 17-23), Nos. 1, 3.

Beyond exercising its contractual ability to provide access to NetJets flights, RS Air had no operations, and Perlman left RS Air unable to perform even that function on its own. Perlman enlisted employees of Rearden to handle flight arrangements and perform bookkeeping and accounting. *See* Aug. 8, 2022 Perlman Decl. for Rearden, ¶ 7. In having RS Air rely on his employees, Perlman did not require RS Air to observe formalities such as compensating them for their services or maintaining agreements or records to memorialize RS Air's use of Rearden's services and resources. *See* Response to NetJets' 2004 Request, No. 10; March 16, 2021 Perlman Decl., ¶¶ 3, 6.

For his part, Perlman stresses how little of the Rearden employees' time was devoted to handling RS Air's affairs. *See id.* (stating that the duties were "light" and "occasional"). But that only

underscores how little there was to do – RS Air had no real existence of its own. To the extent there was any heavy-lifting to be done, Perlman takes credit for having done all of "the significant work" himself. *Id.* (Perlman stating that he personally managed RS Air's business transactions with NetJets and its legal matters). This strongly supports NetJets' assertion that Perlman dominated RS Air.

A major piece of the puzzle regarding RS Air was the tax reason for its existence. According to the Bankruptcy Court, "[t]he primary financial benefit provided by fractional jet ownership is a tax deduction based on depreciation." Bankr. Ct. Doc. 180, p. 6 n.9; *see also* RS Air tax returns (Bankr. Ct. Docs. 47-3, 47-5). Perlman stated that RS Air received a depreciation tax benefit of over $1.3 million from 2007 to 2017.[3] *See* May 18, 2021 Perlman Decl., ¶ 8. Perlman acknowledges that, while the tax benefit was directly received by RS Air, it was fully passed on to him. *Id.* It may be that Perlman will be able to show at the merits stage that his taking of the tax benefit should not count as siphoning, but this consideration weighs in support of NetJets' prima facie case of personal jurisdiction.

Also in NetJets' favor is the showing it has made that Perlman unilaterally controlled RS Air's finances and kept it minimally funded. RS Air had no business revenue or income. *See* Trans. of Dec. 1, 2020 Bankr. Ct. Hearing (Doc. 17-10), pp. 15–17, 37, 42–43; Trans. of Sept. 17, 2021 Bankr. Ct. Hearing (Doc. 17-4), pp. 23–24. Perlman kept the balance on RS Air's bank account below $10,000. *See* Feb. 20, 2020 Ievers Dep., p. 12; RS Air's Business Checking Account Statements (Bankr. Ct. Doc. 47-8). Whenever RS Air needed to pay bills owed to NetJets, Perlman transferred funds from his personal account to RS Air's account. *See* Feb. 20, 2020 Ievers Dep., p. 12; RS Air's Business Checking Account Statements; Response to NetJets' 2004 Request, No. 7. Perlman did the same to fund RS Air's litigation with NetJets. *See* Trans. of Dec. 1, 2020 Bankr. Ct. Hearing, p. 73. According to Perlman himself, the finances of RS Air "passed through the personal account of Mr. Perlman." *See* March 25, 2021 Perlman Decl. (Bankr. Ct. Doc. 141-1), ¶ 7.

Perlman responds by arguing that RS Air was not undercapitalized – when RS Air needed money, he provided it. Given that RS Air had no operations as such, it did not need to maintain a high balance on its account.

Perlman makes a fair point. But in the circumstances presented here, perhaps it is less important whether RS Air was undercapitalized and more important that Perlman appears to have

---

[3] To provide some context, RS Air made total payments of close to $10 million to NetJets from 2001 to 2016. *See* Bankr. Ct. Doc. 180, p. 7 n.9.

solely controlled whether RS Air would be solvent. Whether RS Air had enough money to pay the bills rested entirely within Perlman's discretion. He could, and did, decide to simply stop funding RS Air and make it insolvent. Perlman did not need to answer to anyone in making that decision, nor was there anyone to whom RS Air could turn to avoid that fate.

The Court finds on the record before it at this early stage that NetJets has supported its assertion that RS Air "had no separate mind, will, or existence of its own." *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F.Supp.3d 498, 508 (D. Del. 2017) (internal quotation marks omitted). NetJets has shown that RS Air had no identity apart from Perlman. Thus, NetJets has satisfied its prima facie burden of showing that RS Air and Perlman operated as a single economic entity.

To prevail on an alter ego theory, there must also be present "an overall element of injustice or unfairness." *Trevino*, 583 F.Supp.2d at 529. A court should look to whether the alter ego is using the corporate form to shield himself from liability in a manner that is fraudulent or inequitable. *See Crosse* 836 A.2d at 497; *Blair v. Infineon Techs. AG*, 720 F.Supp.2d 462, 470–71 (D. Del. 2010).

The Court finds that NetJets has made a sufficient showing of the element of injustice or unfairness. NetJets argues that the injustice was Perlman's control and manipulation of RS Air's finances, to the point that he could frustrate creditors by not transferring funds to RS Air and by declaring RS Air insolvent. "[U]nder Delaware law, the same facts used to show that the business entities operated as a single enterprise can lend the requisite fraud or inequity." *Harrison v. Soroof Int'l, Inc.*, 320 F.Supp.3d 602, 620 (D. Del. 2018). NetJets appears to have been RS Air's only non-insider creditor. That Perlman chose to take RS Air into insolvency when he did – on the brink of trial in state court – supports NetJets' assertion of unfairness. In the bankruptcy proceedings, the debtor did not even contest NetJets' proof of breach of contract claims against it. Viewing matters in a light favorable to NetJets, the Court finds the facts support an inference that Perlman used RS Air in manner to shield himself from liability to NetJets. *See* Bankr. Ct. Doc. 139, p. 5 (statement by the Bankruptcy Court that "RS Air elected to file this case to avoid trial in the Ohio state court and is not pursuing affirmative claims against NetJets."). Thus, NetJets has satisfied the element of injustice or unfairness for purposes of its prima facie case of personal jurisdiction.

Turning now to the Perlman Trust, the Court finds that the record contains evidence that the Trust became the sole member of RS Air at some point in time. *See* Trans. of Dec. 9, 2020 Bankr. Ct. Hearing, pp. 4, 27. The Court finds that NetJets has sufficiently shown that Perlman possibly used his control over the Trust as a means by which he controlled RS Air. Until the matter is clarified, the Trust should remain as a defendant.

Accordingly, the Court finds that it has personal jurisdiction over the Perlman defendants and thus denies their motion to dismiss.

### D. Rearden

Rearden, as another one of Perlman's LLCs, is a sister company to RS Air. While Delaware law allows for horizontal veil-piercing, plaintiff must satisfy enough of the alter ego factors to show that the sister companies are operating as a single economic unit. *See Maxus Energy*, 641 B.R. at 558; *Official Comm. of Unsecured Creditors v. Highland Capital Mgmt. L.P.*, 454 B.R. 574, 587 (Bankr. D. Del. 2011).

The Court finds that NetJets has not established a prima facie case of personal jurisdiction against Rearden. The missing component is control, whether formal or informal. Rearden did not have an ownership interest in RS Air, and it was neither a member nor a manager of RS Air. *See* Aug. 8, 2022 Perlman Decl. for Rearden, ¶ 7. Rearden was used by Perlman to benefit RS Air by providing administrative and bookkeeping services. But, without more, Rearden's occasional conferring of a benefit on RS Air does not demonstrate control, particularly when it was Perlman (not Rearden) who decided how and when Rearden's resources would be used to RS Air's benefit.

NetJets stresses that Perlman owned and controlled both entities. That may be true, but there are no allegations or evidence that Perlman used Rearden as the means by which he exerted control over RS Air or that he otherwise operated the two companies as a single entity. Rearden had its own identity apart from RS Air. It had employees and functioned as an incubator for startup technologies.

Finally, NetJets argues that Rearden was a source of funds for RS Air. Perlman's practice was to reimburse RS Air for the flight time used by Rearden. *See* March 25, 2021 Perlman Decl., ¶ 7. He did this by transferring funds from Rearden's account into his own. In turn, he transferred funds from his account to RS Air in order to pay bills to NetJets. *Id.*

Again, without more the Court finds the element of control lacking. Rearden appears to have simply reimbursed RS Air, indirectly, for the value of the flights services it received. Rearden is not alleged to have had access to RS Air's account or to have controlled the flow of funds into RS Air's account. Instead, Perlman exercised sole discretion over the making and timing of payments to RS Air.

Accordingly, the Court finds that it does not have personal jurisdiction over Rearden.

**IV.     Conclusion**

For the reasons stated above, the Perlman defendants' motion to dismiss for lack of personal jurisdiction (doc. 9) is DENIED.  Rearden's motion to dismiss for lack of personal jurisdiction (doc. 7) is GRANTED.

NetJets' motion to file a surreply (doc. 23) is DENIED.


DATE: December 16, 2022                               *s/ James L. Graham*
                                                                         JAMES L. GRAHAM
                                                                         United States District Judge