IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NetJets Aviation, Inc., *et al.*,

        Plaintiffs,

    v.

Stephen G. Perlman., *et al.*,

        Defendants.

Case No: 2:22-cv-2417

Judge Graham

Magistrate Judge Jolson

<u>Opinion and Order</u>

Plaintiff NetJets Aviation, Inc. brings this diversity action against defendants Stephen G. Perlman and the Stephen G. Perlman Revocable Trust. *See* 28 U.S.C. § 1332. NetJets seeks a declaratory judgment that Perlman is the alter ego of non-party RS Air LLC. RS Air owes over $1.7 million to NetJets by virtue of a judgment which NetJets obtained on an allowed claim brought in the Chapter 11 bankruptcy case of RS Air.

This matter is before the Court on the parties' respective motions in limine, brought in advance of a scheduled bench trial. The Court conducted a final pretrial conference with the parties on May 22, 2026 and therein denied both motions. This Opinion and Order memorializes and provides further reasoning for the Court's rulings.

## I.     Background

NetJets is a Delaware corporation with its principal place of business in Ohio. It sells fractional ownership interests in private business aircraft. In 2001, Stephen Perlman, a California resident, formed RS Air as a Delaware LLC and used it to purchase a fractional share in a NetJets aircraft. Perlman was the sole member and manager of RS Air. Over time, RS Air bought shares in two other aircraft.

For each transaction, NetJets and RS Air entered into purchase and management agreements under which RS Air was entitled to a certain amount of flight time per year. NetJets provided management and support services, such as the provision of crew members, flight planning, aircraft repair, and maintenance. Purchasers owed a fixed monthly fee for management services. They also

owed an "occupied hourly fee," which represented the variable costs associated with each hour of flight time.

The relationship between NetJets and RS Air soured in July 2017 when a Cessna Citation X aircraft in which RS Air owned a share was involved in a non-injury incident at an airport in Henderson, Nevada.  The aircraft was damaged and declared a total loss for insurance purposes. NetJets denied responsibility for the incident and claimed it did not affect RS Air's ability to exercise its rights and privileges because NetJets provided RS Air with access to other aircraft.

Perlman was suspicious of the cause of the incident and was displeased with NetJets' handling of the matter.  According to Perlman, NetJets attempted to force RS Air into an aircraft substitution agreement.  The proposed agreement was unacceptable to him because, among other things, it valued the aircraft at its salvage value.  After RS Air independently obtained information about the incident and the aircraft's insurance coverage, Perlman concluded that the insured replacement value was materially greater than the valuation which NetJets had shared with RS Air.  Perlman believed that NetJets had attempted to withhold information from him because it intended to pocket the difference between the insurance proceeds and what it had offered to pay or credit to RS Air.

Perlman wanted to end the relationship between RS Air and NetJets.  He proposed that NetJets buy back at fair market value RS Air's shares in the aircraft and that NetJets refund the value of RS Air's prepaid flight hours.  RS Air would keep what it learned about NetJets confidential. NetJets did not accept that proposal.

NetJets sued RS Air in Ohio state court in June 2018.  NetJets alleged that RS Air had breached its contractual obligations by failing to pay monthly management fees and occupied hourly fees. NetJets asserted that the failure to pay led to an event of default under which it had a contractual right to buy back RS Air's interest in each plane at fair market value minus the unpaid fees.  Net Jets sought over $2.1 million in damages.

RS Air filed several counterclaims, including for fraud relating to NetJets' conduct following the Citation X incident.  RS Air also asserted a counterclaim for breach of contract, alleging that NetJets had failed to pay RS Air the pre-incident fair market value of its share in the Citation X.  RS Air sought damages of over $1 million.

Shortly before the state court case was set to go to trial, RS Air filed a Chapter 11 bankruptcy petition in the Northern District of California on November 6, 2020.

NetJets filed a proof of claim, asserting that it was an unsecured creditor in the amount of $2,133,263. In support, NetJets attached its complaint in the Ohio state court action. NetJets was RS Air's largest non-insider creditor and held 98% of non-insider debt.

NetJets also filed a motion to dismiss the bankruptcy proceedings on the grounds that the petition was filed in bad faith and for purposes of thwarting the Ohio state court action. The Bankruptcy Court denied NetJets' motion to dismiss. The court called it a "close decision" because there were factors which supported a conclusion of good faith but also factors which supported a conclusion of bad faith. Ultimately, the court found that the Plan of Reorganization submitted by the debtor demonstrated its intentions to proceed in good faith.

NetJets moved for an order allowing it to assert an alter ego cause of action on the debtor's behalf. NetJets argued that it had standing to bring a derivative claim against Perlman because the debtor had failed to bring a veil-piercing claim against him. The Bankruptcy Court denied this motion, holding that the proposed claim was not colorable because NetJets' allegations failed to support a finding that either: (1) RS Air and Perlman functioned as a single economic entity, or (2) there existed an overall element of injustice or unfairness.

NetJets additionally filed a motion to apply setoff. NetJets proposed that RS Air would liquidate its remaining fractional shares and operating credits with NetJets. NetJets would pay $365,692 to the estate to buy back the shares. The Bankruptcy Court found that the elements for setoff were satisfied and thus granted NetJets' motion.

The debtor proposed a Plan of Reorganization for a Small Business, to which NetJets objected. NetJets argued that the Plan was a disguised liquidation designed to allow Perlman to evade liability owed to NetJets. The Bankruptcy Court rejected this argument and held that the Plan was fair and equitable and proposed in good faith.

The Bankruptcy Court confirmed the Plan on October 17, 2021. Under the Confirmed Plan, NetJets' $2,133,263 claim was allowed and offset by $365,692, for a net allowed claim of $1,767,571.15. RS Air had no remaining assets for unsecured creditors, but Perlman agreed to contribute $100,000 in new value to be distributed to unsecured creditors, chiefly NetJets.

The parties filed numerous appeals to the Bankruptcy Appellate Panel of the Ninth Circuit. Two of those appeals are worth noting. First, the B.A.P. reversed the Bankruptcy Court's decision denying NetJets' motion to assert a derivative alter ego claim. The B.A.P. held that the Bankruptcy Court erred by weighing the probative value of NetJets' veil-piercing allegations. The B.A.P. found that NetJets had stated a colorable claim because the "factual allegations which, taken as true, can

establish some of the factors which courts may rely upon under Delaware law, including that Debtor was not adequately capitalized, ignored corporate formalities, and functioned as a façade." *In re RS Air, LLC*, No. 21-1102 (B.A.P. 9th Cir. Apr. 26, 2022), Doc. 53, p. 9.

Second, the B.A.P. affirmed the Bankruptcy Court's confirmation of the Plan of Reorganization. *In re RS Air, LLC*, No. 21-1227 (B.A.P. 9th Cir. Apr. 26, 2022), Doc. 31. It did so in an order that was issued simultaneously with the B.A.P.'s reversal of the derivative alter ego decision. The B.A.P. said this meant that further proceedings on the alter ego issue would be unnecessary. The bankruptcy estate had not asserted a veil-piercing claim, and the Confirmed Plan did not administer or dispose of such a claim. The estate's ability to assert a claim terminated upon the Plan becoming effective. The B.A.P.'s affirmance of the Plan thus mooted NetJets' attempt to assert a derivative alter ego claim.

## II.    NetJets' Motion in Limine

NetJets seeks to preclude Perlman from offering evidence or argument at trial about the merits of the claims and counterclaims asserted in the litigation between NetJets and RS Air in Ohio state court (the "Ohio litigation"). NetJets contends that the proceedings in the Bankruptcy Court conclusively resolved those claims. In particular, NetJets' bankruptcy proof of claim (which rested entirely on the Ohio complaint) was allowed by the Bankruptcy Court in the amount of $1,767,571.15, after a setoff. RS Air's counterclaims (which mirrored its Ohio counterclaims) were deemed waived by the Confirmed Plan. NetJets thus argues that RS Air's liability to NetJets cannot be relitigated or questioned in this action.

In response, Perlman agrees he cannot challenge that RS Air owed over $1.7 million to NetJets. Perlman contends, however, that some evidence concerning the Ohio litigation will be necessary to explain the historical context of the parties' relationship and the current lawsuit.

NetJets appears to concede that some evidence about the existence of the Ohio litigation would help provide context. *See* Doc. 137 at PAGEID 7320 ("To be clear, NetJets does not seek to exclude evidence of procedural steps or occurrences in the Ohio State Litigation."). But NetJets remains concerned that Perlman will attempt to reargue the validity of the breach of contract claim and the fraud counterclaim. NetJets argues that evidence about the parties' contractual repurchase obligations (as between NetJets and RS Air), management fees, and insurance coverage is not relevant to the alter ego claim.

Perlman argues that evidence about the sequence of events and about the basis of NetJets' alleged damages in the Ohio litigation is relevant, and the Court agrees. An important consideration is the nature of the alter ego claim which NetJets brings. Alter ego liability is a type of corporate veil-piercing theory, and it is equitable in nature. *See In re Maxus Energy Corp.*, 641 B.R. 467, 499, 506 (Bankr. D. Del. 2022). To prevail on an alter ego claim, a plaintiff must show that the company and its alleged alter ego "operated as a single economic entity" and that "an overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 528 (D. Del. 2008). "The purpose of allowing the corporate veil to be pierced on an alter ego theory is to hold the party actually responsible for the inequitable conduct accountable and to prevent that party from using another corporation to shield itself from liability." *In re Opus East, LLC*, 528 B.R. 30, 57–58 (Bankr. D. Del. 2015); *see also Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (alter ego theory applies where dominant person or company "has created a sham entity designed to defraud investors and creditors").

A court should take into account "the totality of the circumstances" in determining "whether in a particular case justice and equity requires that the entity be disregarded to prevent fraud or injustice." *In re Maxus*, 641 B.R. at 505, 507 (internal quotation marks omitted). A multi-factor test applies to determine whether a "single economic entity" existed: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders." *Trevino*, 583 F.Supp.2d at 528–29. "While no single factor justifies a decision to disregard the corporate entity, some combination of the above is required, and an overall element of injustice or unfairness must always be present, as well." *Id.* at 529 (internal quotation marks omitted).

NetJets' alter ego theory relies on the assertion that Perlman took RS Air into bankruptcy to escape the Ohio litigation and avoid paying the contract fees allegedly owing to NetJets. Perlman's motive and intent are thus directly relevant, as is whether he retained benefits for which he did not pay. The timing of events and the basis for the parties' positions in the Ohio litigation will likely assist this Court's analysis of the totality of the circumstances and the alter ego factors. Perlman should have an opportunity to demonstrate that RS Air's filing for bankruptcy protection did not stem from manipulation or abuse of the corporate form. According to him, NetJets' damages "did not arise out of RS Air's refusal to pay for services used in the normal course, i.e., flights taken or maintenance fees incurred and not paid for." Doc. 140 at PAGEID 7338. Instead, Perlman asserts, it was NetJets

5

which used the Ohio litigation to create a "financial shockwave that necessitated" the filing of bankruptcy. *Id.* at PAGEID 7339 n. 1. NetJets allegedly did so by demanding that RS Air pay over $2 million in jet storage fees and legal fees accrued during the pendency of the Ohio litigation.

Accordingly, the Court denies NetJets' motion in limine. During trial, the Court will not consider evidence offered for the purpose of bringing into doubt the rulings of the Ohio state court or the Bankruptcy Court. But the Court will consider evidence relating to the Ohio litigation which bears upon the motives and intentions of the parties.

## III.    Perlman's Motion in Limine

Perlman moves to preclude NetJets from offering evidence and argument about his alleged conduct in the RS Air bankruptcy proceeding. Perlman anticipates that NetJets will attempt to satisfy the "overall element of injustice or unfairness" prong of its alter ego claim by showing that he misused the bankruptcy proceedings or engaged in improper or bad faith conduct during the course of the bankruptcy case. This may include NetJets' introduction of evidence that Perlman manipulated friendly creditors to support the proposed Plan of Reorganization. Perlman argues that such a theory of liability is barred as a matter of federal bankruptcy preemption, which is an affirmative defense asserted in the Amended Answer. *See* Doc. 133.

The doctrine of bankruptcy preemption recognizes that "the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal." *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir.1996) ("It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process."). In *Pertuso v. Ford Motor Credit Co.*, the Sixth Circuit held that state law claims which "presuppose a violation of the Bankruptcy Code" are preempted, because "[p]ermitting assertion of a host of state law causes of action to redress wrongs under the Bankruptcy Code would undermine the uniformity the Code endeavors to preserve and would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 233 F.3d 417, 426 (6th Cir. 2000) (internal quotation marks and alterations omitted).

NetJets argues that preemption is inapplicable because NetJets is not pursuing a state law claim seeking damages arising out of alleged misconduct committed during bankruptcy proceedings. Rather, NetJets contends that it is simply seeking to introduce evidence of Perlman's conduct to establish his alter ego status. The liability of RS Air has already been established, and the alter ego claim would not alter that judicial determination.

The Court finds that consideration of evidence concerning Perlman's conduct in the bankruptcy proceedings would not run afoul of the bankruptcy preemption doctrine.  NetJets' alter ego claim does not presuppose a violation of the Bankruptcy Code, nor does it require adjudication of the rights and duties of creditors and debtors.  NetJets is not asserting a state law claim which seeks an award of damages allegedly caused by a bankruptcy litigant's abuse of process or misconduct.  NetJets is not, for instance, asserting a claim for unjust enrichment or fraud arising from conduct committed in the bankruptcy proceedings.  *See, e.g., In re Miles*, 430 F.3d 1083, 1093 (9th Cir. 2005) (preemption applies to "state law tort causes of action for damages entirely predicated upon the filing and prosecution of involuntary bankruptcy petitions").

Perlman advocates for broad preemption, but the Sixth Circuit has been careful to observe that "field preemption is inapplicable in the area of bankruptcy exemptions."  *In re Schafer*, 689 F.3d 601, 614 (6th Cir. 2012) (citing *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918) ("[S]tate laws are thus suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress.").  The Court finds no inherent conflict with bankruptcy law by hearing evidence of Perlman's conduct in the bankruptcy proceedings.  By considering such evidence and potentially relying upon such evidence to find that Perlman was RS Air's alter ego, the Court would not be impairing the access which an entity like RS Air enjoys to seek bankruptcy protection.  Nor would the protection which RS Air obtained from the Bankruptcy Court be lessened in any way.  The Court would not be imposing liability on RS Air, whose liability has already been established in the bankruptcy proceedings.

Furthermore, allowing the evidence would not undermine the Bankruptcy Court's rulings.  It would be used to determine whether the debt established by the Bankruptcy Court can be collected from Perlman.  The Court acknowledges that care must be taken not to cast doubt upon any of the Bankruptcy Court's holdings, such as its conclusion that RS Air's confirmation plan was proposed in good faith and was fair and equitable to creditors.  But the standard to be applied for alter ego purposes is distinct from the bankruptcy standards for sanctionable or frivolous conduct, bad faith, and so forth.  *See* Fed. R. Bankr. P. 901; 11 U.S.C. §§ 105(a), 303(i).  The alter ego analysis will examine whether Perlman and RS Air operated as a single economic entity and examine the circumstances for an overall element of injustice or unfairness, which would include consideration of Perlman's pre-petition conduct as well.  As was stated with respect NetJets' motion in limine, evidence of the parties' motives and intentions are directly relevant to the alter ego claim.  The Court believes that it can conduct the alter ego analysis without, as Perlman fears, adjudicating the propriety of Perlman's or RS

7

Air's conduct under bankruptcy law.  The Court, of course, reserves the right to exclude certain evidence or arguments if it later finds that a conflict with the bankruptcy proceedings has materialized.

Two final considerations inform the Court's conclusion that hearing evidence of Perlman's bankruptcy-related conduct will not conflict with bankruptcy law.  For one, NetJets attempted in the bankruptcy case to bring a derivative alter ego claim on behalf of the debtor.  Ultimately it was unable to do so for reasons related to the timing of the B.A.P.'s decision affirming the Confirmed Plan of Reorganization, which mooted NetJets' attempt to assert an alter ego claim.  An important equitable concern is that if Perlman's motion in limine is granted, then the timing of the bankruptcy rulings, outside of NetJets' control, will have limited NetJets' ability to prove the alter ego claim – a claim which the B.A.P. recognized as colorable but for which the bankruptcy proceedings did not provide NetJets an opportunity to litigate.

Lastly, the B.A.P. saw no conflict or tension with allowing NetJets to pursue its alter ego theory against Perlman in this action.  After NetJets filed this case, Perlman filed a motion in the Bankruptcy Court for an order holding NetJets in contempt.  He argued that NetJets had violated the Bankruptcy Court's Order of Discharge by filing a lawsuit in this Court.  The Bankruptcy Court denied the motion for contempt, and Perlman appealed.  The B.A.P. affirmed in a published decision.  *See In re RS Air, LLC*, 651 B.R. 538 (B.A.P. 9th Cir. 2023).   It held that the discharge injunction regarding RS Air "does not . . . extinguish the debt or protect any other entity from its liability on that debt. . . .  We publish to confirm that the discharge injunction does not protect a debtor's alter egos."  *Id.* at 540.  The B.A.P. thus found that NetJets' pursuit of an alter ego claim in this case against Perlman did not violate the discharge injunction.  *See id.*, 651 B.R. at 545 ("RS Air continues to owe the full amount of the debt; the discharge injunction precludes collection of that debt from RS Air, but not from anyone else.").

The Court thus finds that NetJets should be permitted to use evidence of Perlman's conduct during the bankruptcy proceedings to prove its alter ego claim.

## IV.     Conclusion

Accordingly, the Court DENIES NetJets' motion in limine (Doc. 137) and Perlman's motion in limine (Doc. 136).

DATE: June 5, 2026                                      *s/ James L. Graham*
                                                                       JAMES L. GRAHAM
                                                                       United States District Judge